# United States Court of Appeals

## For the First Circuit

_____

No. 00-1107

CONSOLIDATED CIGAR CORPORATION; GENERAL CIGAR CO., INC.;
HAVATAMPA, INC.; JOHN MIDDLETON, INC.;
L.J. PERETTI CO., INC.; SWISHER INTERNATIONAL, INC.;
TOBACCO EXPORTERS INTERNATIONAL (USA) LTD.;
SWEDISH MATCH NORTH AMERICA, INC.;
Plaintiffs, Appellants,

v.

THOMAS F. REILLY, ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS,
Defendant, Appellee.

_____

LORILLARD TOBACCO COMPANY;
BROWN & WILLIAMSON TOBACCO CORPORATION;
R.J. REYNOLDS TOBACCO COMPANY;
PHILIP MORRIS, INC.; UNITED STATES TOBACCO COMPANY;
Plaintiffs.

_____

UNITED STATES,
Interested Party.

_____

No. 00-1117

LORILLARD TOBACCO COMPANY;
BROWN & WILLIAMSON TOBACCO CORPORATION;
R.J. REYNOLDS TOBACCO COMPANY;
PHILIP MORRIS, INC.;
Plaintiffs, Appellants,

v.

THOMAS F. REILLY, ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS,

Defendant, Appellee.

_____

UNITED STATES TOBACCO COMPANY;
CONSOLIDATED CIGAR CORPORATION; GENERAL CIGAR CO., INC.;
HAVATAMPA, INC.; JOHN MIDDLETON, INC.;
L.J. PERETTI CO., INC.; SWEDISH MATCH NORTH AMERICA, INC.;
SWISHER INTERNATIONAL, INC.;
TOBACCO EXPORTERS INTERNATIONAL (USA) LTD.;
Plaintiffs.

————————————

UNITED STATES,
Interested Party.

————————————

No. 00-1118

UNITED STATES TOBACCO COMPANY,
Plaintiff, Appellant,

v.

THOMAS F. REILLY, ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS,
Defendant, Appellee.

————————————

LORILLARD TOBACCO COMPANY;
BROWN & WILLIAMSON TOBACCO CORPORATION;
R.J. REYNOLDS TOBACCO COMPANY;
PHILIP MORRIS, INC.; CONSOLIDATED CIGAR CORPORATION;
GENERAL CIGAR CO., INC.; HAVATAMPA, INC.;
JOHN MIDDLETON, INC.; L.J. PERETTI CO., INC.;
SWEDISH MATCH NORTH AMERICA, INC.;
SWISHER INTERNATIONAL, INC.;
TOBACCO EXPORTERS INTERNATIONAL (USA) LTD.;
Plaintiffs.

————————————

UNITED STATES,
Interested Party.

————————————

-3-

No. 00-1270

LORILLARD TOBACCO COMPANY; PHILIP MORRIS, INC.;
R.J. REYNOLDS TOBACCO COMPANY;
BROWN & WILLIAMSON TOBACCO CORPORATION;
UNITED STATES TOBACCO COMPANY;
CONSOLIDATED CIGAR CORPORATION; GENERAL CIGAR CO., INC.;
JOHN MIDDLETON, INC.; L.J. PERETTI CO., INC.;
SWEDISH MATCH NORTH AMERICA, INC.;
SWISHER INTERNATIONAL, INC.;
TOBACCO EXPORTERS INTERNATIONAL (USA) LTD.;
Plaintiffs, Appellees,

v.

THOMAS F. REILLY, ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS,
Defendant, Appellant.

_____

UNITED STATES,
Interested Party.

_____

Nos. 00-1271
     00-1272
     00-1275

LORILLARD TOBACCO COMPANY;
BROWN & WILLIAMSON TOBACCO CORPORATION;
R.J. REYNOLDS TOBACCO COMPANY;
PHILIP MORRIS, INC.; UNITED STATES TOBACCO COMPANY;
CONSOLIDATED CIGAR CORPORATION;
GENERAL CIGAR CO., INC.; HAVATAMPA, INC.;
JOHN MIDDLETON, INC.; L.J. PERETTI CO., INC.;
SWEDISH MATCH NORTH AMERICA, INC.;
SWISHER INTERNATIONAL, INC.;
TOBACCO EXPORTERS INTERNATIONAL (USA) LTD.;
Plaintiffs, Appellees,

v.

THOMAS F. REILLY, ATTORNEY GENERAL OF THE

COMMONWEALTH OF MASSACHUSETTS,
Defendant, Appellant.

————————————

UNITED STATES,
Interested Party.

————————————

No. 00-1273

LORILLARD TOBACCO COMPANY;
BROWN & WILLIAMSON TOBACCO CORPORATION;
R.J. REYNOLDS TOBACCO COMPANY;
PHILIP MORRIS, INC.; UNITED STATES TOBACCO COMPANY;
CONSOLIDATED CIGAR CORPORATION;
HAVATAMPA, INC.; JOHN MIDDLETON, INC.;
L.J. PERETTI CO., INC.; SWEDISH MATCH NORTH AMERICA, INC.;
SWISHER INTERNATIONAL, INC.;
TOBACCO EXPORTERS INTERNATIONAL (USA) LTD.;
PHILIP MORRIS, INC.;
Plaintiffs, Appellees,

v.

THOMAS F. REILLY, ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS,
Defendant, Appellant.

————————————

UNITED STATES,
Interested Party.

————————————

No. 00-1274

CONSOLIDATED CIGAR CORPORATION; GENERAL CIGAR CO., INC.;
HAVATAMPA, INC.; JOHN MIDDLETON, INC.;
L.J. PERETTI CO., INC.; SWISHER INTERNATIONAL, INC.;
TOBACCO EXPORTERS INTERNATIONAL (USA) LTD.;
SWEDISH MATCH NORTH AMERICA, INC.;
LORILLARD TOBACCO COMPANY; PHILIP MORRIS, INC.;

-5-

R.J. REYNOLDS TOBACCO COMPANY;
BROWN & WILLIAMSON TOBACCO CORPORATION;
UNITED STATES TOBACCO COMPANY;
Plaintiffs, Appellees,

v.

THOMAS F. REILLY, ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS,
Defendant, Appellant.

_____

UNITED STATES,
Interested Party.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

_____

Before

Torruella, Chief Judge,

Bownes, Senior Circuit Judge,

and Lipez, Circuit Judge.

_____

James V. Kearney, with whom Latham & Watkins, Peter G. Hermes, Peter C. Netburn and Hermes, Netburn, O'Connor & Spearing, P.C. were on brief, for appellants Consolidated Cigar Corp., General Cigar Co., Inc., Havatampa, Inc., John Middleton, Inc., L.J. Peretti Co., Inc., Swedish Match North America, Inc., Swisher International, Inc. and Tobacco Exporters International (USA) Ltd.

Henry C. Dinger, P.C., with whom Cerise Lim-Epstein, Goodwin, Procter & Hoar, LLP, Verne W. Vance, Jr., John H. Henn, Foley, Hoag & Eliot, Andrew S. Krulwich, Thomas W. Kirby, Daniel E. Troy, William A. McGrath, Wiley Rein & Fielding, Richard M. Zielinski, Robert D. Ryan, Hill & Barlow, John B. Connarton, Jr. P.C., Carol-Lynn M. Bear, Connarton, Wood & Callahan. Clausen Ely, Patricia A. Barald and Covington & Burling were on brief, for appellants Philip Morris Incorporated, Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company and R.J. Reynolds Tobacco Co.

George J. Skelly, with whom Michael D. Blanchard, Eric S. Sarner and Skadden, Arps, Slate, Meagher & Flom LLP were on brief, for appellant United States Tobacco Company.

Steven G. Brody, Cadwalader, Wickersham & Taft and Gilbert H. Weil on brief, for Association of National Advertisers, Inc., amicus curiae.

Daniel J. Popeo, Richard A. Samp and Washington Legal Foundation on brief, for Washington Legal Foundation, amicus curiae.

William W. Porter, CA, Assistant Attorney General, with whom Susan Paulson, CA, Assistant Attorney General, was on brief, for appellee.

Douglas N. Letter, Appellate Litigation Counsel, Civil Division, U.S. Department of Justice, with whom David W. Ogden, Acting Assistant Attorney General, and Donald K. Stern, United States Attorney, were on brief, for the United States, amicus curiae.

Brian Wolfman, David C. Vladeck, Richard J. Whitney, Speir & Whitney, George A. Hacker, Donald W. Garner, Michael L. Ile, Anne M. Murphy and Leonard A. Nelson on brief, for American Medical Association, American Heart Association, American Lung Association, American Cancer Society, Center for Science in the Public Interest, Public Citizen, Inc. and the Massachusetts Medical Society, amici curiae.

_____

July 17, 2000

_____

**TORRUELLA, <u>Chief Judge</u>.** Before the Court is a challenge to regulations promulgated by the Attorney General of Massachusetts which restrict the sale, promotion, and labeling of tobacco products in an effort to reduce the use of such products by minors. Three groups of tobacco companies[1] have sued the Attorney General, claiming that the Massachusetts regulations are partially preempted by federal law, that the regulations violate their First Amendment right to free speech, and that the regulations violate the Commerce Clause of the Constitution. After due consideration of the arguments pressed by all parties and by amici curiae, and with full appreciation of the importance of the public health issue underlying this case, we conclude (1) that the regulations are not preempted by federal law, (2) that the regulations do not violate the First Amendment, and (3) that parts of the regulations unconstitutionally burden interstate commerce. Accordingly, we affirm in part and reverse in part the decision of the district court.

## I. Factual and Procedural Background

On January 22, 1999, the Attorney General of Massachusetts promulgated regulations now codified at title 940, sections 21.00 through 21.07 (cigarettes and smokeless tobacco) and title 940, sections 22.00 through 22.09 (cigars) of the Massachusetts Code of

---

[1] The appellants in these consolidated appeals include manufacturers of cigarettes, smokeless tobacco products, and cigars.

Regulations.  The regulations declare certain types of conduct by manufacturers, distributors, and sellers of tobacco products to be per se "unfair or deceptive acts or practices" prohibited under chapter 93A, § 2(a) of the Massachusetts General Laws.  For example, the regulations prohibit a number of retail practices including promotional give-aways and mail ordering without age verification, see 940 C.M.R. §§ 21.04(1), 22.06(1), as well as measures aimed specifically at outlet sales practices, see id. §§ 21.04(2)-(3), 22.06(2)-(3).  Of particular concern to the tobacco companies, the Massachusetts regulations also prohibit the following advertising practices:

> (a) Outdoor advertising, including advertising in enclosed stadiums and advertising from within a retail establishment that is directed toward or visible from the outside of the establishment, in any location that is within a 1,000 foot radius of any public playground, playground area in a public park, elementary school or secondary school;

> (b) Point-of-sale advertising . . . any portion of which is placed lower than five feet from the floor of any retail establishment accessible to persons younger than 18 years old, which is located within a 1,000 foot radius of any public playground, playground area in a public park, elementary school or secondary school.

Id. §§ 21.04(5), 22.06(5).  A single exception to the advertising ban permitted the display of a so-called "tombstone" sign stating "Tobacco products sold here," see id. §§ 21.04(6), 22.06(6), but this provision

-11-

was struck down by the district court on preemption grounds.[2] Finally, the regulations also prescribe mandatory warning statements to be included on all cigar labeling and advertising. See id. §§ 22.04, 22.05.

In response to the promulgation of the regulations, three separate suits were filed in federal district court by the appellants in this consolidated appeal, who are makers and sellers of cigarettes, smokeless tobacco products, and cigars. The cigarette and smokeless tobacco companies claimed that the Massachusetts regulations were preempted by the Federal Cigarette Labeling and Advertising Act (FCLAA), codified as amended at 15 U.S.C. §§ 1331-41, and that the regulations violated their commercial speech rights under the First Amendment.[3] The cigar companies also challenged the regulations on First Amendment grounds, as well as claiming that the regulations imposed an undue burden on interstate commerce in violation of the Commerce Clause. In an opinion issued December 2, 1999, the district court rejected the preemption arguments of the cigarette and smokeless tobacco producers. See Lorillard Tobacco Co. v. Reilly, 76 F. Supp. 2d

---

[2] This aspect of the district court's decision has not been appealed and therefore is not before us.

[3] Although the FCLAA applies only to cigarettes, the smokeless tobacco companies join the cigarette makers' challenge because they contend that the regulations may not be severed to preserve the smokeless tobacco provisions if the cigarette provisions are declared invalid. We do not reach this aspect of the companies argument because we hold that the regulations are not preempted by the FCLAA.

124 (D. Mass. 1999)(Lorillard I). In a January 24, 2000 opinion, the district court likewise rejected the tobacco companies' First Amendment claims, as well as the cigar makers' Commerce Clause challenge. See Lorillard Tobacco Co. v. Reilly, 84 F. Supp. 2d 180 (D. Mass. 2000) (Lorillard II).[4] Judgment was entered on January 25, 2000 in favor of the Attorney General, and this appeal followed.

On appeal, the tobacco companies raise the following issues: (1) whether the Massachusetts regulations are preempted by federal law, (2) whether the regulations' advertising restrictions violate the First Amendment, (3) whether certain restrictions imposed on retail practices violate the First Amendment, (4) and whether the regulations' cigar warnings requirements violate the First Amendment and the Commerce Clause. The Attorney General cross-appeals one issue -- whether the regulations' indoor advertising restrictions violate the First Amendment.

## II. Law and Application

### A. Preemption

#### 1. Introduction

_____

[4] The district court did invalidate one aspect of the regulations under the First Amendment, finding that the Attorney General had failed to demonstrate that the point-of-sale provisions requiring indoor advertisements to be at least five feet from the floor were sufficiently tailored to serve the government's interests. See Lorillard II, 84 F. Supp. 2d at 192-93.

-13-

The Supreme Court has explained the analysis for determining when a state regulation is preempted by a federal law that contains specific preemption language. In Medtronic, Inc. v. Lohr, 518 U.S. 470, 484-86 (1996), the Court stated that, to identify the domain expressly preempted by the federal statute, two presumptions about the nature of preemption must be considered. First, particularly when Congress has "'legislated . . . in a field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" Id. at 485. Second, in determining the scope of the federal preemption, the "ultimate touchstone" is Congress's purpose as "discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." Id. at 486. In this respect, it is relevant to consider the "'structure and purpose of the statute as a whole,' as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." Id.

The tobacco companies argue, rather weakly we might say, that the "presumption against preemption" should not be applied in this case because the presumption "is not triggered when the State regulates in an area where there has been a history of significant federal

-14-

presence." United States v. Locke, 120 S. Ct. 1135, 1147 (2000). However, as the Court noted in Locke, the area at issue there -- maritime commerce -- is one in which "Congress has legislated from the earliest days of the Republic, creating an extensive federal statutory and regulatory scheme." Id. at 1148. We have little difficulty distinguishing the historically pervasive federal regulation of fields such as maritime commerce, see, e.g., Kelly v. Washington, 302 U.S. 1, 4 (1937) ("The federal acts and regulations with respect to vessels on the navigable waters of the United States are elaborate. They were well described in the argument of the Assistant Solicitor General as a maze of regulation."), from Congress's relatively recent entry into the regulation of the tobacco industry. The thirty-five years that have passed since passage of the FCLAA, with its limited scope when compared to federal regulation of fields such as maritime commerce, can hardly serve as a basis for supplanting the traditional state authority in matters of public health, particularly that of minors. See Medtronic, 518 U.S. at 475 ("Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are 'primarily, and historically, . . . matters of local concern,' the 'States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'"

(citations omitted)). The "presumption against preemption" applies with full force to this case.

We turn, therefore, to our task of identifying "the domain expressly preempted" by § 1334(b), id. at 484, keeping in mind (1) the presumption that Congress does not intend to supplant state regulation in the area of public health and the health of minors without a clear and manifest indication of such preemptory purpose, see id. at 485, and (2) that our decision must "rest primarily on a 'fair understanding of congressional purpose,'" as informed by the text, the statutory framework, and the purpose of the FCLAA as a whole, id. at 486.

## 2. The Preemptive Scope of § 1334(b)

Section 1334(b) of the FCLAA states that "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b). To date, four other federal courts of appeals have addressed the preemptive scope of this provision. See Lindsey v. Tacoma-Pierce County Health Dep't, 195 F.3d 1065 (9th Cir. 1999); Greater New York Metro. Food Council v. Giuliani, 195 F.3d 100 (2d Cir. 1999); Federation of Advertising Indus. Representatives, Inc. v. City of Chicago, 189 F.3d 633 (7th Cir. 1999) ("FAIR"); Penn Advertising of Baltimore, Inc. v. Mayor & City Council of Baltimore, 63

F.3d 1318 (4th Cir. 1995). We find the Second and Seventh Circuits' decisions in Giuliani and FAIR to be particularly helpful.

In Giuliani, the United States Court of Appeals for the Second Circuit focused on the ambiguity in the phrase "with respect to" advertising and promotion. See Giuliani, 195 F.3d at 105. As the court noted, a "hyper-literal" reading of that phrase would preempt a range of state regulation which Congress surely did not intend to affect. Id. For example, "it could divest states and municipalities of authority to prevent tobacco advertisers from posting their ads in public buildings even though smoking is legally prohibited there. Or . . . it could lead to the conclusion that 'states [are] without power to prohibit a cigarette company from handing out free cigarettes in an elementary school yard.'" Id. (citing FAIR, 189 F.3d at 633).

Given the ambiguity of the preemption provision, the Second Circuit endeavored to discern Congress's intent in enacting § 1334(b). Relying on the FCLAA's statement of purpose at 15 U.S.C. § 1331, the court reached two conclusions regarding the intended scope of § 1334(b): first, that Congress sought to inform the public of the health risks associated with smoking, and second, that while so informing the public Congress also sought to protect the national economy from the burdens that would result from a multitude of "'diverse, nonuniform, and confusing' advertising standards." See Giuliani, 195 F.3d at 106. The court logically concluded that §

-17-

1334(b)'s preemption provision was intended to further that congressional balance by preempting state regulations that would frustrate federal law by creating a "'multiplicity of conflicting regulations.'" Id.

Applying this reading of § 1334(b) to a 1000-foot rule essentially identical to that imposed by the Massachusetts regulations, the court found that the regulation was not preempted by the FCLAA because it "[did] not impose obligations 'with respect to' advertising as that phrase is used in § 1334(b)." Id. at 109. The court found that the 1000-foot restriction "do[es] not touch upon Congress's 'comprehensive Federal program' to control cigarette advertising information. The restrictions do not, for example, burden advertisers with a duty to warn. Nor do they impose content and format requirements on advertising information." Id. Although the court did recognize that different states and municipalities might impose differing regulations with regard to the location of tobacco advertising, "[d]ivergent local zoning restrictions on the location of sign advertising are a commonplace feature of the national landscape and cigarette advertisers have always been bound to observe them." Id.

Finally, the court in Giuliani also emphasized that "the presumption against preemption is particularly strong here, as these provisions are the sort thought to lie within the heartland of the states' historic powers." Id. (citing Medtronic, 518 U.S. at 485).

Both zoning regulations and regulations directed at the safety and welfare of minors, the court said, "lie peculiarly within the states' historic police powers." Id. (citing Packer Corp. v. Utah, 285 U.S. 105, 111 (1932) (zoning restrictions on cigarette advertising), and Toy Mfrs. of America, Inc. v. Blumenthal, 986 F.2d 615, 620 (2d Cir. 1992)). Far from the clear and manifest intent required to preempt state regulation in such areas, the court noted that the legislative history of § 1334(b) suggests that Congress specifically intended to give such traditional state laws "wide berth." Id. at 10 (citing S. Rep. No. 91-566, reprinted in 1970 U.S.C.C.A.N. at 2663). Based on the foregoing, the Second Circuit held that the 1000-foot restriction was not preempted by the FCLAA.

The United States Court of Appeals for the Seventh Circuit used a similar analysis to find that § 1334(b) did not preempt Chicago regulations restricting the advertising of cigarettes and alcoholic beverages. Relying largely on the Supreme Court's decision in New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance, 514 U.S. 645 (1995), in which the court considered the similar preemption provision of the Employee Retirement Income Security Act (ERISA), the Seventh Circuit concluded that "[i]f the FCLAA language ('with respect to advertising and promotion') were viewed with an 'uncritical literalism,' the effect would be to 'read Congress's words of limitation as mere sham, and to read the presumption against

-19-

pre-emption out of the law whenever Congress speaks to the matter with generality.'" FAIR, 189 F.3d at 637 (quoting Travelers Ins., 514 U.S. at 656).

As in Giuliani, the FAIR court then turned to an examination of the legislative history and overall scheme of the FCLAA and § 1334(b) to discern the intended scope of the preemption provision. See id. (relying on Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992), and Medtronic, 518 U.S. at 484-85). After examining the statement of purpose found in § 1331 and the legislative history of § 1334(b), the court concluded:

> We therefore must read the language of the FCLAA preemption provision in light of Congress's desire not only to ensure uniformity of regulation with respect to matters of labeling and advertising, but also in light of the manifest congressional concern in preserving for the states the remainder of their traditional police powers.

FAIR, 189 F.3d at 638. Noting that the placement and manner of outdoor advertising is a matter of traditional local concern, the court declined to imply preemption of a regulation of such local interest and importance. Id. at 639. The court further concluded that the restrictions posed no danger of interfering with the FCLAA's advertising and labeling scheme, and held that they were not preempted by § 1334(b).[5]

---

[5] Both the FAIR and the Giuliani courts found that "tombstone" provisions similar to that invalidated by the district court were

-20-

We are persuaded by the reasoning of our sister circuits that Congress did not intend § 1334(b) to preempt the kind of tobacco advertising restrictions imposed by the Massachusetts regulations. The regulations do not interfere with the cigarette and smokeless tobacco labeling and advertising scheme established by Congress, and to the extent that they may create differing restrictions on the location of advertising in various states and municipalities, such divergent restrictions are indistinguishable from the existing zoning regulations in place throughout the country.[6] We do not consider such location restrictions to present the kind of "diverse, nonuniform, and confusing" advertising standards with which Congress was concerned when it enacted the FCLAA. See Giuliani, 195 F.3d at 106-07; see also 15

_____

preempted by § 1334(b). See FAIR, 189 F.3d at 640; Giuliani, 195 F.3d at 108.

[6] The Fourth Circuit, in Penn Advertising, 63 F.3d at 1324, found that Baltimore's restrictions on outdoor cigarette advertisements were not preempted by § 1334(b). Although we do not adopt that court's apparent conclusion that location restrictions do not constitute a "'prohibition based on smoking and health,'" id., we do agree with the general conclusion that Congress did not intend § 1334(b) to preempt restrictions of the kind at issue there and in this case.

-21-

U.S.C. § 1331.[7] Thus, we hold that the Massachusetts regulations are not preempted by the FCLAA.

### B. First Amendment Challenge to Advertising Restrictions

The next claim, urged by all three groups of tobacco companies, is that the advertising restrictions imposed by the Massachusetts regulations violate the companies' First Amendment right to freedom of speech. We find this contention unpersausive.

### 1. Level of Review

The tobacco companies first argue that the advertising and promotion restrictions at issue here should be subject to a more searching review than the "intermediate" scrutiny traditionally applied in commercial speech cases. See generally Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York, 447 U.S. 557, 561-66 (1980). According to the companies, the regulations target tobacco advertising

---

[7] We also note that the Ninth Circuit, in Lindsey, 195 F.3d at 1073, concluded that a county ordinance banning all outdoor tobacco advertising was preempted by § 1334(b). That court determined that "[d]espite the holdings of Penn Advertising, FAIR, and Giuliani, the text of the FCLAA's preemption provision clearly preempts a ban on outdoor advertising because such a ban constitutes a 'requirement or prohibition based on smoking and health . . . with respect to the advertising or promotion of any cigarettes.'" Id. (quoting 15 U.S.C. § 1331). With all due respect, we conclude that the court's analysis fails to avoid the "uncritical literalism" that the Supreme Court has cautioned us against, Travelers Ins., 514 U.S. at 656, and we disagree that "'[t]here is no good reason to believe that Congress meant less than what it said,'" Lindsey, 195 F.3d at 1073, in the phrase "with respect to advertising." We find the decisions of the Second and Seventh Circuits more in line with our reading of Congress's purpose, and more in line with our understanding of the Supreme Court's instructions in the area of federal preemption.

-22-

because of its content and therefore should be subject to a more demanding First Amendment analysis.  The Attorney General, in contrast, characterizes the regulations as content-neutral and urges us to deferentially apply the Central Hudson test for commercial speech restrictions.

First, we repeat our conclusion (reached in the preemption analysis) that the regulations are content-based.  The regulations apply only to advertising "the purpose or effect of which is to promote the use or sale of the [tobacco] product."  940 C.M.R. §§ 21.03, 22.03 (defining "advertisement").  Advertising of other products is not restricted by the regulations, nor is tobacco-related speech that has a purpose or effect other than promotion, such as public health campaigns.  Contrary to the Attorney General's suggestion, this type of focus is plainly content-based.

Such conclusion does not, however, require a greater level of scrutiny than the standard Central Hudson analysis.  The tobacco companies argue that the regulations amount to inherently suspect "viewpoint discrimination" because they ban only speech that invites the purchase of tobacco products.  However, the Supreme Court has made clear that even regulations which single out the promotional speech of a particular industry are analyzed under the Central Hudson test.  See Greater New Orleans Broadcasting Ass'n v. United States, 527 U.S. 173,

-23-

184 (1999) (applying <u>Central Hudson</u> to regulations restricting advertisements for casino gambling).

The tobacco companies nevertheless argue that our decision in <u>AIDS Action Committee</u> v. <u>MBTA</u>, 42 F.3d 1, 11 (1st Cir. 1994), supports the application of a higher level of scrutiny. In that case, Boston's transportation authority refused to display public service advertisements for the AIDS Action Committee on the purported basis that the ads "describe[d] sexual content in a patently offensive way," <u>id.</u> at 5, but agreed to carry ads with similar or more explicit content by other speakers. We held that this disparity gave rise to an appearance that the suppression of speech was based on the identity or perceived viewpoint of the speaker, particularly because the transportation authority did not even attempt to articulate a neutral justification for the disparate treatment. <u>See</u> <u>id.</u> at 11. In contrast, the Attorney General here has not distinguished among speakers by disparately applying a facially neutral provision. On their face, the regulations restrict the promotion of tobacco products, regardless of brand or manufacturer, and permit nonpromotional speech relating to tobacco products by any speaker, tobacco manufacturers and sellers included. The companies make no allegation that the Attorney General has disparately, much less discriminatorily, applied these provisions. Under these circumstances, we do not see the danger of

-24-

viewpoint discrimination that was present in AIDS Action Committee,[8] and we decline to impose a higher level of review on such basis.

In declining to impose a more searching review than that mandated by Central Hudson, we are aware of the recent rumblings from members of the Supreme Court and others suggesting that the Central Hudson test may be in need of minor or major modification. See, e.g., Greater New Orleans Broad. Ass'n, 527 U.S. at 184 ("[C]ertain judges, scholars, and amici curiae have advocated repudiation of the Central Hudson standard and implementation of a more straightforward and stringent test for assessing the validity of governmental restrictions on commercial speech."). Nevertheless, it is not our role to anticipate changes in well-established constitutional doctrines. See Buzynski v. Oliver, 538 F.2d 6, 7 (1st Cir. 1976) ("Although there are circumstances in which it is appropriate for a court of appeals to

---

[8] Notwithstanding the tobacco companies' cries of mistreatment, the context in which the Massachusetts regulations were promulgated simply does not compare to that surrounding the suppression of speech in AIDS Action Committee. In that case, the suppression was directed at a group advocating sexual health practices, particularly with regard to AIDS -- an issue that evokes deep feelings and often prejudices in our society. Furthermore, the suppression of speech in AIDS Action Committee, which was done with no contemporaneous explanation of reasons or basis, also came after a previous ad campaign had provoked public complaints which included a substantial display of homophobia. See AIDS Action Committee, 42 F.3d at 3. We found those particular circumstances to give rise to a presumption of viewpoint discrimination, but we did not suggest that ordinary commercial speech regulations, such as those at issue in this case, would give rise to a similar presumption absent comparable circumstances, which are simply not present here.

disregard the teachings of earlier Supreme Court decisions, generally the Supreme Court has the exclusive authority to overrule its decisions." (citation omitted)).  We are therefore bound to apply the Central Hudson test, as is, to this case.

### 2.  The Central Hudson Test

In Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 566 (1980), the Supreme Court summarized the four-part analysis used to determine the constitutionality of governmental restrictions on commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must [1] concern lawful activity and not be misleading.  Next, we ask [2] whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, we must determine [3] whether the regulation directly advances the governmental interest asserted, and [4] whether it is not more extensive than is necessary to serve that interest.

Under this analysis, the government bears the burden of identifying a substantial interest and justifying the challenged restriction.  See Greater New Orleans Broad. Ass'n, 527 U.S. at 183.  Mindful that the four prongs of the analysis are "to a certain extent, interrelated," id., we will consider them seriatim.

### a.  Nonmisleading Speech Concerning Lawful Activity

Although the Attorney General is unwilling to entirely concede that the tobacco advertisements at issue here are truthful, nonmisleading speech about a lawful activity, he was willing to assume that much for the purposes of summary judgment. We therefore need not explore this prong of the analysis.

### b. **Substantial Interest**

The second prong of the Central Hudson test requires that the state identify a substantial state interest underlying the challenged regulations. Several such interests have been identified by the Attorney General.

The first state interest proffered by the Attorney General is the Commonwealth's desire "to eliminate deception and unfairness in the way [tobacco products] are marketed, sold and distributed in Massachusetts." 940 C.M.R. §§ 21.01, 22.01. Leaving aside for now whether such interest is served by the regulations, we have no doubt that it is a substantial state interest. Indeed, the state interest in protecting consumers from false and misleading commercial information was the original justification for a more permissive First Amendment analysis in the commercial speech area. See, e.g., Central Hudson, 447 U.S. at 563-64.

The next state interest identified by the Attorney General is the Commonwealth's aim "to address the incidence of [tobacco] use by children under legal age." 940 C.M.R. § 21.01; see also id. § 22.01.

-27-

This general state interest is subdivided in the briefs into two distinct, but related, interests. First, the Attorney General asserts a state interest in ensuring compliance with state law, which prohibits the sale of tobacco products to minors, and we consider that interest substantial. Second, the Attorney General relies on the state's interest in protecting the health of children from the negative effects associated with the use and abuse of tobacco products, which is also substantial.

The tobacco companies argue that Massachusetts cannot have a substantial interest in depriving consumers of truthful information in a paternalistic effort to protect them by "keeping them in the dark." We certainly agree with this proposition insofar as it relates to underline adult consumers, in which circumstance the First Amendment mandates that the consumer, rather than the government, judge the value of the information being communicated. See, e.g., 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 503-04 (1996). However, the courts have consistently recognized that the government may act more protectively where children are concerned. See Erzoznick v. City of Jacksonville, 422 U.S. 205, 212 (1975) ("It is well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults."); Anheuser-Busch, Inc. v. Schmoke, 101 F.3d 325, 329-30 (4th Cir. 1996) (citing cases in support of the proposition that "children deserve

-28-

special solicitude in the First Amendment balance because they lack the ability to assess and analyze fully the information presented through commercial media"). Where, as here, the state acts to protect minors, its substantial interest is not vitiated by the admittedly paternalistic nature of its regulation.

### c.  **Whether the Regulations "Directly Advance" the State's Interests**

A great deal of the written and oral argument submitted in this case has concerned the third prong of our Central Hudson analysis -- whether the Massachusetts regulations "directly advance" the Commonwealth's interests.  After a careful review of the record, we hold that the regulations satisfy this prong of our inquiry.

The Supreme Court has recently emphasized that the government's burden regarding this third prong of the Central Hudson analysis

> "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."  Consequently, "the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose."

Greater New Orleans Broad. Ass'n, 527 U.S. at 188 (quoting Edenfield v. Fane, 507 U.S. 761, 770-71 (1993), and Central Hudson, 447 U.S. at 564).  The companies and the Attorney General dispute both whether the harms recited by the Commonwealth are real and whether the regulations will alleviate them to a material degree.  Although the two aspects of the inquiry are closely interrelated in this case, we address them separately for the sake of convenience and, hopefully, clarity.

### i.  __Real Harms__

Like so many contentious issues in the law, the dispute over whether the harms cited by the Attorney General are "real" is in part a dispute over the level of generality at which the inquiry itself should be made.  The Attorney General, adopting a broader perspective, urges that the record and common sense amply support his contention that there is a problem with underage tobacco use, in the United States generally and in Massachusetts in particular.  The Attorney General further asserts that this problem of underage tobacco use is substantially related to, and thus may be materially alleviated by restrictions upon, advertising.  The tobacco companies, on the other hand, urge a more narrow perspective.  They argue that the Attorney General has failed to demonstrate a teen cigarette smoking problem in Massachusetts, and that he certainly has shown no problem with underage consumption of smokeless tobacco or cigars.  Furthermore, the companies charge, to the extent that there may be a problem with tobacco use by minors, the record does not establish any connection between such underage use and the types of indoor and outdoor advertising and promotion restricted by the regulations.  The Attorney General's principal response to the companies' emphasis on product-specific analysis, which response was accepted in large part by the district court, is that the three types of tobacco products subject to the regulations pose similar health concerns and similar dangers in the way

-31-

they are promoted, and thus may and should be regulated pursuant to one common scheme.

First of all, we have some difficulty accepting the Attorney General's suggestion that "what is good for cigarettes is good for cigars," at least in the First Amendment context. To accept such a proposition could conceivably open the door to unforeseen and unjustified speech regulation on the mere theory that products are related or share ingredients. On the other hand, of course, the Attorney General need not offer separate justifications for regulation of green and red M & M's, to give an exaggerated example, and our commercial speech doctrine must allow the legislative and executive branches to make reasonable economies in their regulation of comparable products. However, we need not decide today whether, and under what circumstances, a "regulation by association" scheme might be acceptable in the commercial speech context, because we find that the Attorney General has offered sufficient product-specific evidence regarding cigarettes, smokeless tobacco, and cigars to demonstrate that the dangers posed by underage use of each is a "real harm" and that the regulations can be reasonably expected to alleviate those harms to a material degree.

Before addressing the product-specific information presented by the Attorney General, however, we do note that he is not the first to recognize that "tobacco use, particularly among children and

adolescents, poses perhaps the single most significant threat to public health in the United States." FDA v. Brown & Williamson Tobacco Corp., 120 S. Ct. 1291, 1315 (2000). After conducting the most extensive rulemaking procedure in history, the Food and Drug Administration promulgated regulations not unlike those issued by the Attorney General. See 61 Fed. Reg. 44619-45318. Although the Supreme Court recently struck down the FDA regulations because it found that the agency did not have authority to regulate tobacco products, the Court explicitly emphasized "the seriousness of the problem that the FDA has sought to address" and stated that the agency had "amply demonstrated" its significance. Brown & Willamson, 120 S. Ct. at 1315. At this level of generality, we feel that the risk of harm posed by tobacco use, and particularly by underage tobacco use in this country, is established beyond reasonable dispute. Again, we need not decide whether this alone satisfies the "real harm" aspect of the "directly advances" prong, however, because the Attorney General has provided us with additional information to support his view that underage use of cigarettes, smokeless tobacco products, and cigars poses a real danger to the Commonwealth of Massachusetts.

### i(A). Cigarettes

The Attorney General's case is strongest against cigarettes, which have become emblematic of the health risks associated with tobacco use in this country. In his summary judgment papers and in his

submissions to this Court, the Attorney General refers at length to precisely the kinds of studies and summaries of statistical and anecdotal evidence accepted by the Supreme Court to justify commercial speech restrictions.  See Florida Bar v. Went For It, Inc., 515 U.S. 618, 626-28 (1995) ("[W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.'" (citations omitted)); Affidavit of Michael G. Hering and exhibits thereto, Joint Appendix at 1184-3087.  These submissions are replete with evidence that smoking, particularly by minors, poses a significant risk to the public health and is a widespread practice.  See, e.g., U.S. Dep't of Health & Human Servs., Preventing Tobacco Use Among Young People: A Report of the Surgeon General (1994), Joint Appendix at 1203, 1223 ("Cigarette smoking during childhood and adolescence produces significant health problems among young people, including cough and phlegm production, an increased number and severity of respiratory illnesses, decreased physical fitness, and unfavorable lipid profile, and potential retardation in the rate of lung growth and the level of maximum lung function."); Massachusetts Dep't of Pub. Health, Adolescent Tobacco Use in Massachusetts: Trends Among Public Schools Students 1984-1996 (1997), Joint Appendix at 2272, 2281.  As such, they are more than sufficient

to demonstrate that the harm cited by the Attorney General is a real one.

### i(B). <u>Smokeless Tobacco</u>

The makers of smokeless tobacco products present two principal arguments for why, even assuming that Massachusetts could justify its regulation of cigarettes, the use of smokeless tobacco products does not present a comparable problem. First, the smokeless tobacco producers argue that the vast majority of the information relied upon by the Attorney General to justify the regulations concerns cigarettes specifically and not smokeless tobacco. Second, they point to studies indicating that, whatever national trends may exist, smokeless tobacco consumption by minors has actually decreased in Massachusetts during recent years. We address these arguments in turn.

The smokeless tobacco producers are correct that the Attorney General has been able to garner more information on the use and negative effects of cigarettes than of other tobacco products. However, the Attorney General does point to various sources specific to smokeless tobacco, including the relevant parts of the FDA regulations struck down but factually accepted by the Supreme Court in <u>Brown & Williamson</u>, as well as independent published studies. <u>See</u>, <u>e.g.</u>, Choi et al., <u>Does advertising promote smokeless tobacco use among adolescent boys?  Evidence from California</u>, Joint Appendix at 2516. Furthermore, the state's brief sets forth substantial anecdotal evidence detailing

-35-

the highly successful marketing of smokeless tobacco to young consumers beginning in the late 1960s and early 1970s. Of course, the companies object that this data is dated and that it does not specifically evaluate the impact of outdoor advertising such as that principally targeted by the Massachusetts regulations, but we think that such objections demand more than Central Hudson requires. The Attorney General has adequately demonstrated that smokeless tobacco consumption by underage users poses a real danger.

The companies' second point is that the Massachusetts Department of Health study upon which the Attorney General largely relies actually shows a sharp decline in the use of smokeless tobacco by young people in Massachusetts between 1993 and 1996, in which time such use fell from 8.0 percent to 4.5 percent. See Mass. Dep't of Pub. Health, Independent Evaluation of the Massachusetts Tobacco Control Program, Joint Appendix at 3752. Although we understand the companies' frustration at increased regulation while current efforts seem to be bearing fruit, we do not think that partial successes in fighting underage smokeless tobacco use robs the Commonwealth of its authority to remedy what remains of the problem. Even according to the study emphasized by the smokeless tobacco makers, a not-insignificant number of minors continues to use smokeless tobacco products in Massachusetts, and nothing submitted by the companies contradicts the Attorney General's evidence that this remaining use poses a significant health

-36-

risk to those users, now and as they age.  We therefore conclude that the Attorney General has satisfied this aspect of his burden with regard to smokeless tobacco products.

### i(C).  Cigars

The cigar makers largely echo the first argument pressed by the smokeless tobacco makers above -- that the Attorney General impermissibly relies on studies and anecdotal evidence concerning cigarette smoking to justify regulation of cigars.  Again, we find that the state has presented sufficient evidence to support its conclusion that underage cigar smoking constitutes a real harm.

The Attorney General relies heavily on a monograph published by the National Cancer Institute in 1998.  See National Cancer Inst., Monograph 9, Cigars: Effects and Trends (1998), Joint Appendix at 2572. As that study sets forth in more detail, cigar smoking presents a serious risk of disease, comparable in type and severity to that attributed to cigarette smoking.  See id. at 2588.  The study also concludes that the "data on cigar use among adolescents is also alarming," referring specifically to Massachusetts for evidence of "a substantial level of cigar use, even prior to high school."  Id. at 2598.  We think that this evidence weighs very heavily in the Attorney General's favor.[9]

---

[9] The study also sheds light on the FDA's decision to not regulate cigars when it regulated cigarettes and smokeless tobacco in 1996, abstention much touted by the cigar companies in their briefs.

-37-

The Attorney General also relies on anecdotal evidence of the successful advertising campaign waged by smokeless tobacco in the 1960s and 1970s (mentioned above) and a similar successful campaign by cigarette manufacturers in the 1940s and 1950s. He argues that these advertising campaigns have demonstrated a willingness and an effectiveness on the part of tobacco producers in the use of "image-related" advertisements to stimulate tobacco markets, and that minors are particularly susceptible to this type of advertising. The companies argue that this anecdotal evidence is dated and cannot establish a link between youth cigar smoking and advertising, particularly not the kind of advertising at issue here. Once again, we think that the standard urged by the tobacco companies demands more than is required by Central Hudson and its progeny. The Attorney General has sufficiently demonstrated that cigar use among minors poses a real danger in Massachusetts.

### ii. Whether the Restrictions Will Alleviate the Cited Harms to a Material Degree

The second aspect of the third prong of the Central Hudson analysis is also hotly disputed by the parties. The tobacco companies argue that the Attorney General has failed entirely to demonstrate that advertising causes underage smoking or that advertising restrictions of

---

According to the monologue, data on youth cigar usage was largely unavailable until recently. See Cigars: Effects and Trends, Joint Appendix at 2598.

-38-

the type at issue here will have any effect on underage tobacco use, much less result in a material reduction. The companies pointedly attack the studies submitted by the Attorney General and assert that several of those very studies decline to assert a cause-effect relationship between advertising and smoking. The Attorney General responds with a common sense argument on the causal relationship between advertising and product use, supported by a number of studies and anecdotal evidence demonstrating at least a correlation between advertising and tobacco use in general and among children in particular. We think that the Attorney General has carried his burden.

The "common sense" argument asserted by the Attorney General -- that advertising has some cause-effect relationship with consumption -- is not a novel one. Indeed, the Supreme Court recognized in Central Hudson itself that "[t]here is an immediate connection between advertising and demand." 447 U.S. at 569. More recently, in Rubin v. Coors Brewing Co., 514 U.S. 476, 487 (1995), the Court found it "assuredly a matter of 'common sense' that a restriction on advertising of a product characteristic will decrease the extent to which consumers select a product on the basis of that trait." But see Greater New Orleans Broad. Ass'n, 527 U.S. at 189 ("While it is no doubt fair to assume that more advertising would have some impact on overall demand for gambling, it is also reasonable to assume that much of that advertising would merely channel gamblers to one casino rather than

-39-

another."). After all, the five leading cigarette manufacturers spent approximately $5.66 billion on advertising and promotion in 1997, and nearly $300 million on outdoor advertising alone. See Federal Trade Comm'n, Report to Congress for 1997, Joint Appendix at 2544. It would defy common sense to conclude that for-profit corporations which have demonstrated their ability to survive and flourish in the market would pour such tremendous resources into advertising without at least some calculation that their efforts would have a substantial effect on consumption of their product. As a general proposition, we think that common sense does support the Attorney General's position.

The Attorney General, however, does not rest on common sense arguments alone. He cites myriad sources to support his proposition that tobacco advertising and tobacco use are causally related, including notably a Surgeon's General's report concluding that "cigarette advertising appears to increase young people's risk of smoking," see U.S. Dep't of Health & Human Servs., Preventing Tobacco Use Among Young People: A Report of the Surgeon General (1994), Joint Appendix at 1203, and the FDA's extensive investigation and finding that "advertising plays a material role in the decision by those under 18 to use tobacco products," see 60 Fed Reg. 44466 (1996), Joint Appendix at 1513. Nearly two thousand pages of the joint appendix in this case consist of reports and surveys by governmental, scientific, and academic entities submitted by the Attorney General in support of

-40-

his dual proposition that tobacco use by minors poses a real risk and that tobacco advertising contributed materially to this problem.[10] Although we decline to summarize that material here, we have no difficulty concluding that it is sufficient to satisfy the Attorney General's burden of demonstrating that the restrictions will alleviate the harm caused by underage smoking to a material degree.

The smokeless tobacco and cigar manufacturers also repeat the argument that the majority of the materials submitted by the Attorney General concern primarily or exclusively cigarettes, and that such materials cannot justify restrictions on smokeless tobacco and cigar advertisements. We agree that the cigarette regulations are the supported most abundantly, in terms of the sheer size of record submitted by the Attorney General. That, however, is not determinative. The product-specific information submitted by the Attorney General, taken in conjunction with the other statistical and anecdotal information presented, is sufficient to carry his burden. See Florida Bar, 515 U.S. at 626-28.

---

[10] To be sure, the companies have presented studies in which no correlation or causal relationship was found between advertising and tobacco use. They also are critical of several of the studies cited by the Attorney General. However, the fact that there may exist differences of opinion on this issue is insufficient to deprive Massachusetts of its ability to enact regulations based on a well-founded conclusion that advertising restrictions will reduce tobacco use among young people.

Finally, the cigar manufacturers argue that the Massachusetts regulations cannot reasonably be expected to reduce cigar consumption in Massachusetts, because the advertising of cigars is nearly nonexistent in comparison with the pervasive promotion of cigarettes. For instance, the cigar makers do not use any billboards in Massachusetts, and they spent only $50,500 on outdoor advertising in the entire United States during 1997, compared to the nearly $300 million spent by the leading cigarette manufacturers in that year. While this argument is a forceful one, it fails to persuade us that the regulations are unjustified. Although the regulations will necessarily have a small impact on the amount of existing advertising (because relatively little exists), they will remove any outdoor advertising that does currently fall within 1000 feet of a school or playground, thus protecting those particular children. As the Attorney General has demonstrated, children exposed to tobacco advertising near their schools and play areas are likely to be affected by its message. Although fewer children will be affected by cigar advertising, simply because there is much less of it, the relative lack of current cigar advertising also means that the burden imposed on cigar advertisers is correspondingly small. We cannot conclude that, under these particular circumstances, the First Amendment bars the Attorney General from regulating cigar advertising of the type targeted here, especially when

we consider that he has done so as part of a rational and well-founded comprehensive tobacco regulatory scheme.

In sum, we conclude that the Attorney General has carried his burden of demonstrating that the regulations will "directly advance" his goals of reducing both underage tobacco use and tobacco sales to minors.[11] Less advertising may reasonably be expected to reduce the consumption of tobacco products by current users, insofar as there will be fewer reminders to stop at the store to pick up a pack of cigarettes, a can of smokeless tobacco, or a cigar (at least on the way to and from schools and playgrounds, where Massachusetts has focused its efforts). Moreover, the restrictions on advertising should reduce the number of new or future users by reducing the visibility of tobacco products to minors, by dispelling the advertising-encouraged notion that tobacco products are pervasive and form part of the "good life," and by eliminating the psychological incentives to tobacco use presented by things as simple as attractive ad color and design (aspects of advertising which we agree may reasonably be assumed to have greater effect on young people). Because the Attorney General has submitted sufficient data to demonstrate the harms posed by underage tobacco use and to support his view that the regulations will diminish

---

[11] We are not persuaded that the regulations further the state's interest in prohibiting the dispersion of false and misleading information to consumers. However, because the other interests identified by the Attorney General are directly advanced, this failure does not require invalidation of the regulations.

underage tobacco consumption in both of these ways, we conclude that he has satisfied his burden under prong three of the <u>Central Hudson</u> analysis.

### d. The Regulations Do Not Restrict More Speech than Necessary

The fourth and final prong of the <u>Central Hudson</u> analysis requires that the government not restrict more speech than necessary to achieve its purposes.  In <u>Board of Trustees of the State University of New York</u> v. <u>Fox</u>, 492 U.S. 469, 477 (1989), the Supreme Court explained that this is not a "least restrictive means" standard.  Summarizing its holding, the Court stated:

> What our decisions require is a "'fit' between the legislature's ends and the means chosen to accomplish those ends"--a fit that is not necessarily perfect, but reasonable;  that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served;" that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.  Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.

<u>Id.</u> at 480.  We hold that the Massachusetts advertising regulations satisfy this requirement.

The companies' first argument that the Massachusetts regulations are not sufficiently tailored to satisfy the First Amendment is that, although the regulations facially apply only to areas within 1000 feet of a school or playground, the actual effect of

-44-

the regulations is to prohibit virtually all advertising in as much as ninety percent of the land area of Massachusetts' three largest metropolitan areas, Boston, Worcester, and Springfield. Although this is certainly a valid point (even the Attorney General concedes that the reach of the regulations is substantial), it does not vitiate the tailoring of the speech restrictions in this case. While the amount of land within 1000 feet of a school or playground may be substantial, its sheer size cannot defeat the obvious connection to the state's interest in protecting minors, which is served directly by limiting application of the regulations to areas near schools and playgrounds -- areas where children are more likely to be. We also find no indication that the Attorney General adopted the 1000-foot rule as a proxy or pretext for a more general ban on tobacco advertising, in the Commonwealth's largest metropolitan areas or elsewhere in the state. Under the circumstances, we do not think that the substantial geographical reach of the regulations violates the First Amendment.

The companies also challenge the 1000-foot rule itself, arguing that it is both arbitrary and overly extensive. However, the Supreme Court in Fox explicitly noted "the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires, and provide[d] the Legislative and Executive Branches needed leeway" in fashioning effective but proportionate commercial speech regulations. See Fox, 492 U.S. at 480.

-45-

The Attorney General based his 1000-foot determination primarily on the FDA's implementation of a comparable rule in its 1996 regulations, which, as noted, followed an extensive rulemaking procedure. Such reliance on the conclusions of a lengthy federal investigation should hardly be called arbitrary. Furthermore, it is worth noting that the industry has voluntarily refrained from billboard advertising within 500 feet of schools since 1990, which suggests that they recognize the value of such restrictions in principle. The contention that 500 feet is acceptable but that 1000 feet is somehow arbitrary strikes us as splitting hairs, particularly because this type of determination is generally better suited for legislative and executive decisionmakers than for the courts; in any event, it is a greater judicial second-guessing than is appropriate under the Central Hudson analysis for commercial speech restrictions. In the end, one thousand feet -- a mere three city blocks -- does not strike us as an unreasonable distance in which to assume that minors present at or on their way to or from schools and playgrounds would be most affected by outdoor advertising. Whether or not it is a perfect "fit," it is a reasonable one, and that is what is required by Central Hudson and Fox.

Oddly enough, the district court struck down the 1000-foot boundary in the context of indoor advertising, concluding that the Attorney General had offered no basis for it other than the FDA regulations, which themselves did not restrict indoor ads. The

-46-

Attorney General has appealed this aspect of the district court's decision, and we reverse, largely for reasons mentioned in the previous paragraph. It is hardly unreasonable for the Attorney General to determine that stores within 1000 feet of schools and playgrounds -- that area where children are most likely to be present -- will also be more likely to receive minors as customers. In fact, we do not doubt that the companies would have challenged the rationality of the Attorney General's regulatory scheme if it did not include restrictions on advertisements at the point of sale. We do have some misgivings about the effectiveness of a restriction that is based on the assumption that minors under five feet tall will not, or will less frequently, raise their view above eye-level, but we find that such determination falls within that range of reasonableness in which the Attorney General is best suited to pass judgment. In any event, the burden on speech imposed by the provision is very limited (there are no restrictions whatsoever on advertising above the five-foot level, so long as it is not visible from the street), and we find the compromise to be narrowly tailored and a reasonable "fit." Fox, 492 U. S. at 480.

The tobacco companies' next argument is that the Attorney General may not regulate commercial speech when there exist several reasonable alternatives that would restrict no or less speech. In particular, the companies argue that Massachusetts should be required to more stringently enforce current laws prohibiting tobacco sales to

minors, and perhaps make tobacco use itself illegal for minors, before restricting tobacco advertising and promotion. We are not persuaded by this line of argument in this case. First, Massachusetts has not chosen speech restrictions as its first or only punch in its fight against underage tobacco use. To the contrary, the Commonwealth is widely considered a leader in many aspects of tobacco regulation. See, e.g., Center for Disease Control, Best Practices for Comprehensive Tobacco Control Programs (Aug. 1999), Joint Appendix at 684 (referring throughout to Massachusetts as a leader in tobacco control). Although the companies question this characterization, they offer no evidence to the contrary, nor do they offer any persuasive evidence that the state is neglecting to conscientiously and vigorously enforce its current laws. Second, in light of Fox, we do not think that Massachusetts should be required to criminalize underage tobacco use before it can regulate tobacco advertising around its schools and playgrounds. There are legitimate reasons why the state may not want to make underage tobacco use a crime; after all, the state's motivation is to protect children, not to institutionalize them. Third, the principal function of advertising is to propose a commercial transaction, in this case the sale of tobacco products -- which, where minors are concerned, is already illegal in Massachusetts. And finally, while criminalization of underage tobacco use or possession (or stricter enforcement of existing laws, for that matter) might reduce the amount of current

tobacco use, it is unlikely to serve the government's interest in reducing the demand for tobacco products among young people. The advertising regulations, in contrast, can reasonably be expected to reduce demand. For all of these reasons, we conclude that Massachusetts need not exhaust yet more alternatives in its ongoing efforts to curb underage tobacco use before restricting commercial speech in the targeted way that it does with the regulations.

The next area of dispute between the parties concerns the alternative modes of communication left open to tobacco manufacturers and retailers. The Attorney General emphasizes that the regulations do not restrict advertising and promotion in print media, such as newspapers and magazines. The tobacco companies, in response, note that tobacco advertising is already prohibited from television and radio.[12] They also point out that, while newspaper and magazine advertising may be a viable alternative for major manufacturers and some large retailers (as evidenced in part by the prevalence of cigarette and cigar ads in magazines), such media are cost-prohibitive for many vendors of tobacco products such as small groceries and convenience stores. These smaller vendors of tobacco products, the companies argue, are left without any reasonable alternative means for communicating with the public.

---

[12] Congress prohibited such advertising of cigarettes and little cigars in 1971, see 15 U.S.C. § 1335, and of smokeless tobacco products in 1986, see 15 U.S.C. § 4402(f).

Although we find this argument quite a strong one, it does not require invalidation of the regulations because it does not vitiate the narrow tailoring of the restrictions on speech. After all, only businesses within 1000 feet of a school or playground -- the area reasonably determined by the Attorney General to present the greatest exposure to minors -- will be affected by the regulations. And even within those areas, the regulations as written explicitly permitted retailers to display so-called "tombstone" signs. See 940 C.M.R. § 21.04(6). These signs would have allowed retailers to communicate to legitimate consumers the availability of tobacco products, albeit less forcefully than larger, more colorful advertising. Unfortunately (for tobacco sellers), the district court found this aspect of the regulations preempted by the FCLAA, and the Commonwealth has not appealed that ruling. We nevertheless are of the view that this compromise established by the regulations, as written, is indicative of the kind of "calculation" by the Attorney General that the First Amendment requires of government when it seeks to restrict commercial speech. See Fox, 492 U.S. at 480. And, although the striking of the tombstone exception measurably increases the burden on tobacco sellers (or rather removes an alleviating factor),[13] we cannot conclude that

[13] We do note that, even under the district court's decision, which was premised on the content-based nature of the tombstone provision, the Commonwealth remains able to promulgate a new exception provision that does not dictate the content of a small information sign communicating to legitimate customers the availability of tobacco products, if the

-50-

this vitiates the reasonable fit otherwise established by the regulations.

Finally, the tobacco companies suggest that the regulations are not sufficiently tailored because they deny communication to a large number of adults for the sake of protecting children. However, the cases referred to by the companies, such as United States v. Playboy Entertainment Group, Inc., No. 98-1682, 2000 WL 646196 (U.S. May 22, 2000), Reno v. ACLU, 521 U.S. 844 (1997), and Erznoznik v. City of Jacksonville, 422 U.S. 205 (1975), do not support their position. First, each of those cases dealt with expressive speech, rather than commercial speech, and therefore applied a "strict scrutiny" standard to invalidate the laws, rather than the intermediate scrutiny applicable to commercial speech cases. Furthermore, even in that context, the Court held that "the objective of sheltering children does not suffice to support a blanket ban if the protection can be accomplished by a less restrictive alternative." Playboy Entertainment Group, 2000 WL 646196, at *7 (emphasis added); see also Reno, 521 U.S. at 874 ("[The law's] burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve."). Here, although the geographical scope of the advertising restrictions is substantial, we do not find the restrictions equivalent to a "blanket

Commonwealth so desires.

ban" on speech.  Furthermore, it is difficult to imagine how Massachusetts might effectively shield children from tobacco advertising near schools and playgrounds without incidentally burdening adult communication in that area as it does.  The regulations themselves address this problem by providing an exception for indoor advertising in any establishment that excludes minors, see C.M.R. § 21.04(5)(b), as well by the very fact that the advertising restrictions are focused on areas where children are most likely to be present. Consequently, we think that the burden imposed on adult commercial communication within the 1000-foot perimeter is not so great as to render the regulations invalid under Central Hudson.

### 3.  Conclusion

In conclusion, we hold that the advertising restrictions imposed by the Massachusetts regulations do not violate the First Amendment.  The regulations directly advance the substantial interests identified by the Attorney General, and their restrictions on commercial speech are proportionate to the state's purposes.  As the Supreme Court has stated, "[w]ithin those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed."  Fox, 492 U.S. at 480.

### C.  First Amendment Challenge to Restrictions on Retail Practices

The manufacturers of smokeless tobacco and cigars also challenge the restrictions imposed by the Massachusetts regulations on the use of "self-service" displays as a retail outlet practice.  See 940 C.M.R. § 22.06.  The district court held that this practice is not protected by the First Amendment because it does not constitute speech.  Although the issue is by no means an easy one, we agree and affirm.

On appeal, the tobacco companies argue that self-service displays are "a specialized mode of speech" that communicates information to the consumer and proposes a commercial transaction in much the same way as does advertising.  Although we accept the tobacco companies' proposition that self-service displays often do have some communicative commercial function (covered as they often are in logos

-53-

and other advertising mechanisms), the actual restriction imposed by the regulations is not on speech, but rather on the physical location of actual tobacco products. A familiar analogy illustrates this point. If sellers are so inclined, we see nothing in the regulations prohibiting them from displaying empty tobacco product containers in display cases, so long as no actual tobacco product is so displayed. In that circumstance, just like at the local video store, the consumer can peruse the relevant commercial information at his or her leisure before approaching the sales counter to make an actual purchase. For the vast majority of tobacco products, nearly all of which are distributed in sealed packaging which the consumer may not open and inspect before purchase, we think that this type of regulation poses no cognizable burden on speech, and any secondary imposition is surely so narrow as to be justified by the significant interests served by the regulations.

We do recognize that the sale of higher-end cigars poses a somewhat different circumstance. According to the cigar manufacturers, cigar retailers traditionally allow consumers pre-purchase access to cigars so that the consumer may make his or her selection on the basis of a number of objective and subjective factors including the aroma and feel of the cigar. Unlike the distribution of packaged cigars and little cigars, this specialized retail practice would in fact be burdened by prohibitions on self-service displays, and would implicate

<u>Central Hudson</u> scrutiny if the First Amendment applies to such a retail practice.

However, we need not decide whether this particular form of self-service retail practice constitutes commercial speech protected by the First Amendment, because the regulations pass muster under <u>Central Hudson</u> even assuming <u>arguendo</u> that the commercial speech analysis applies. For the reasons set forth at length above, we conclude that the Attorney General has adequately demonstrated the substantial nature of the state's interests, as well as the general proposition that restrictions on advertising and promotion may reasonably be expected to directly advance those interests. It is apparent that limiting self-service displays and placing tobacco products behind the sales counter will aid in the Commonwealth's efforts to curb the sale of tobacco products to underage consumers and directly advance the state's goals. Finally, the regulations are more than sufficiently tailored to the goals of the regulation, not only because they leave open retail schemes such as those used by video stores, but also because the prohibition on self-service displays does not apply to "[s]elf-service displays that are located within adult-only retail facilities." 940 C.M.R. § 22.06(3)(c). A tobacco specialty store can therefore avoid any burden presented by the regulation by simply closing the store to children, who cannot lawfully purchase tobacco products in any event. We find the fit between ends and means to be very reasonable, and we

therefore conclude that the restrictions on self-service displays are constitutional.

### D.   Challenges to the Cigar Warnings Requirements

In addition to their challenges to the restrictions on advertising, promotion, and self-service displays, the cigar companies also challenge the warning scheme created by the Massachusetts regulations.  Under that scheme, all packages and advertising of cigars must include a warning stating (1) that cigar smoke contains carbon monoxide and nicotine or (2) that cigars are not a safe alterative to cigarettes.  See 940 C.M.R. §§ 22.04-22.05.  The warnings must occupy twenty-five percent of the front or top panel of the package (whichever is larger) and twenty percent of any advertisement, see id. §§ 22.04(2), 22.05(2), although that area may be used for any federal, state, or local warning so long as the Massachusetts warning remains clear and conspicuous, see id. § 22.04(2)(c).  The use of a pre-printed sticker affixed to the package or advertisement constitutes compliance. See id. § 22.04(2)(b).

### 1.   First Amendment Claim

The cigar companies' first argument posits that the warnings requirements violate the First Amendment.  The district court rejected this argument, and we affirm for substantially the reasons set forth in the lower court's opinion.  See Lorillard II, 84 F. Supp. 2d at 197-98.

At the outset, we note that warnings schemes similar to that imposed by the Massachusetts regulations have been repeatedly sustained by the courts. See, e.g., Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 650-53 (1985). Furthermore, the cigar warnings were specifically designed to "fill the gap" in federal law, which requires similar warnings for cigarettes and smokeless tobacco products but not for cigars; this federal scheme has been in place since 1965 and its validity is well established.

As the Supreme Court made clear in Zauderer, there are "material differences between disclosure requirements and outright prohibitions on speech," 471 U.S. at 650, such that "the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed," id. at 651 n.14. Therefore, although the commercial speech analysis applies, the Supreme Court has held that "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." Id. at 651.

On appeal, the cigar companies do not challenge the substantiality of the state's interest in informing consumers of the health risks associated with cigar smoking. Nor do they dispute that the regulations are reasonably related to that interest. Rather, the companies assert that the regulations are nevertheless unconstitutional

-57-

because the very size of the required warnings (twenty-five percent of the main panel of packaging or twenty percent of advertising) "unduly burdens" speech. Cf. id. at 651 ("We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech.").

With respect to the packaging requirements, the companies argue that the warnings are unconstitutional because the Attorney General failed to prove that the Commonwealth's purposes could not be equally well served by warnings covering only, for example, ten percent of the front of top panel of the package. This argument, however, was explicitly rejected by the Supreme Court in Zauderer, where the Court declined to apply a "'least restrictive means' analysis" to disclosure requirements and stated: "[W]e do not think it appropriate to strike down such requirements merely because other possible means by which the State might achieve its purposes can be hypothesized." Id. at 651 n.14. Because the packaging requirements are reasonably related to a substantial state interest and do not unduly burden interstate commerce, they are valid.

With regard to the advertisement warning requirements, the companies argue that the twenty-percent coverage of the warnings will so burden cigar manufacturers that they will cease advertising altogether. The companies offer precious little to support this difficult-to-believe proposition, and we find it unpersuasive. Other

industries, including the manufacturers of cigarettes and smokeless tobacco products, have successfully incorporated warning schemes into their advertising practices, and cigars present no special considerations that lead us to believe a different result will ensue here. Similar to the restrictions upheld in Zauderer, Massachusetts "has not attempted to prevent [cigar makers] from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present." Id. at 650. As such, the advertising restrictions do not violate the First Amendment.

### 2. Commerce Clause Claim

Finally, the cigar companies claim that the cigar warning requirements imposed by the regulations unduly burden interstate commerce in violation of the Commerce Clause. We agree in part.

### a. Advertising Requirements

Section 22.05 of the regulations makes it unlawful "for any persons to advertise or cause to be advertised within Massachusetts any cigar or little cigar unless the advertising bears one of the warning statements . . . and the warning statement . . . comprises 20% of the area of the advertisement and is in the format required." As the district court, appellants, and the Attorney General all apparently agree, this language applies, on its face, to advertisements in national magazines sold in Massachusetts as well as to advertising on the Internet if viewed from an Internet terminal in Massachusetts. The district court, although recognizing the burden on interstate commerce that would result from a plain reading of the regulation, adopted a narrow interpretation under which § 22.05 did not apply to national magazines and Internet advertising, and upheld the regulation. While we agree with the district court's evaluation of the burden that would result from a facial application of the regulation, we think that the provision is not fairly susceptible to the narrowing construction, and we find that it unduly burdens interstate commerce.

The Supreme Court summarized the standard for evaluating nondiscriminatory state regulations on commerce in Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970): "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  The warning requirements, as they apply to advertisements, satisfy the first inquiry of the Pike analysis uncontroversially: informing consumers of the health risks associated with cigar consumption is unquestionably a legitimate local public interest.  However, even accepting the Attorney General's further position that any effect on interstate commerce is only incidental, the resulting burden on interstate commerce is clearly excessive, even in relation to the Commonwealth's strong interest in informing consumers of health risks.

The plain language of the regulations, which makes it unlawful to "cause to be advertised" cigar products in Massachusetts, imposes liability on manufacturers for advertising in national magazines that are distributed in the Commonwealth, as well as for advertising on the Internet which can be viewed from a terminal in Massachusetts.[14]  As the district court recognized, this "would place

---

[14]  On their face, the regulations arguably impose liability on the print and Internet media, as well.

a great burden on interstate commerce since it would require the Massachusetts Warning to be carried by a national magazine in order to ensure that any copies ending up in Massachusetts carry the Warning." Lorillard II, 84 F. Supp. 2d at 203.  The court also concluded that "the Commonwealth's local interest in capturing national magazines [and Internet media] is outweighed by the burden it would place on interstate commerce." Id. We agree with this evaluation of the burden imposed by the regulations, and we similarly conclude that in this respect § 22.05 runs afoul of the Pike analysis.

The district court, however, endeavored to save the regulations from invalidation by adopting a narrow interpretative gloss to avoid the constitutional problems posed by a facial reading.  With little if any support in the language of the regulations, the court held that they would not apply to magazines of truly national distribution, unless the magazine had a regional or Massachusetts version, nor to Internet media.  Id.

Although federal courts may in some circumstances adopt a "narrowing construction to which the law is fairly susceptible," Rhode Island Assoc. of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 36 (1st Cir. 1999), the courts must also take care not to trample the legislative or executive province of state authorities by making unduly substantive additions or changes to laws and regulations.  As the companies point out, the district court's interpretative gloss may pose

its own problems and ambiguities, such as the determination of whether a magazine is "truly national" in scope.  We also are skeptical of the court's reasoning that Internet advertisements are not "within" Massachusetts; although we understand the court's point, and appreciate the difficulties inherent in regulation of speech in "cyberspace," the plain language of the regulations covers a person or entity that advertises on any Internet site viewable from a terminal in Massachusetts.  Most important, there is simply no basis in the language or history of § 22.05 to support the narrow reading of the district court.  See Erzoznick v. City of Jacksonville, 422 U.S. 205, 216 (1975) (rejecting narrowing interpretation where, inter alia, "the ordinance by its plain terms is not susceptible to a narrowing construction").  In sum, although there can be no easily and brightly demarcated line between proper narrowing construction and judicial overreaching, we conclude that the regulations are simply not "fairly susceptible" to the district court's narrowing interpretation.  Rhode Island Assoc. of Realtors, 199 F.3d at 36.

We therefore hold that the warnings requirements for advertising are unconstitutional.  Although appropriate intrastate application of these or similar restrictions may be permissible, § 22.05 does not lend itself to judicial parsing, and we leave it to the Attorney General, if he so wishes, to craft a constitutional warnings requirement for media and other cigar advertising.

### b.  **Packaging Requirements**

The cigar companies also challenge the provision making it unlawful to "manufacture, package, import for sale or distribute within Massachusetts any manufactured cigar or manufactured little cigar the package of which does not bear" the required warning.  940 C.M.R. § 22.04(1).  As all parties seem to agree, this language imposes liability on a manufacturer whenever one of its cigars appears in Massachusetts without the required warning, even when the sale is conducted by third parties without the knowledge or consent of the manufacturer.  We think that this provision burdens interstate commerce in an impermissible manner.

As an initial matter, we would note that we do not find Pike problems with the Attorney General's labeling scheme in general. Similar warnings are required on a range of products by a number of states, see, e.g., California Health & Safety Code § 104550 (cigar labels and warnings); Ala. Code § 8-19-5(23) (making it unlawful to affix a required revenue stamp to improperly labeled cigarette packages); New York Alcoholic Beverage Control Law § 107-a (authorizing and governing state labeling scheme for alcoholic beverages), and the burden on manufacturers and retailers of requiring state-specific packaging, while significant, does not generally outweigh the benefits of informing the public of serious health issues.  We generally agree with the Attorney General that the companies' interest in the

efficiency of a uniform national labeling system cannot override the Commonwealth's substantial interest in protecting its citizens. Although it might not be ideal for the companies to have to coordinate all Massachusetts distribution through a central point to affix labels, this option certainly would give the manufacturers adequate room within which to maneuver, without imposing any undue burden on interstate commerce.

However, there is one aspect of the regulations that renders them unduly burdensome, and that is § 22.05's imposition of liability for third party action. As mentioned above, the regulations impose liability on the manufacturers for every import, sale, or distribution of an improperly labeled package in Massachusetts, even when the sale or distribution is made by a third party unconnected with the manufacturer, such as a mail-order seller in another state or any other distributer, wholesaler, or retail seller that sells cigars to Massachusetts consumers independent of the manufacturer. Under this scheme, the manufacturers may not safely label only those packages intended for Massachusetts; instead, to protect themselves against liability for conduct totally without their control, the manufacturers have no choice but to include the Massachusetts warnings on <u>all</u> packages, just in case one should later appear in Massachusetts through unforeseen channels. This harsh practical effect of the regulations stands in sharp contrast to all other warnings schemes of which the

-65-

Court is aware, which typically impose liability on the ultimate seller, thus containing the law's effect intrastate and also allowing all affected parties to take the necessary precautions to comply with the law and avoid substantial liability. In this respect, we conclude that the benefit derived from the regulations is clearly outweighed by the substantial burdens placed on interstate commerce.

Unlike the advertising requirements, the labeling provisions are not easily susceptible to parsing of what is constitutional and what runs afoul of the Commerce Clause. Therefore, although we would find many aspects of the package labeling provisions to pass constitutional muster, we must invalidate them in their entirety and leave it to the Attorney General to reformulate them, if he so desires, in a manner consistent with this decision and the Constitution. We therefore hold 940 C.M.R. § 22.04 to be unconstitutional and without effect, except insofar as it provides the warnings and format specifications required in 940 C.M.R. § 22.05.

## III.  Conclusion

For the reasons set forth above, we hold that the Massachusetts regulations are not preempted by federal law, do not violate the First Amendment, and do not violate the Commerce Clause except for 940 C.M.R. § 22.04 and § 22.05. The judgment of the district court is

**Affirmed in part, reversed in part.**